UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JAMES HUGHES et al., | CASE NO. 3:24-cv-05114-DGE |
| Plaintiff, | ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 13, 17) |
| v. | |
| AMERICAN STRATEGIC INSURANCE CORP et al., | |
| Defendant. | |

## I     INTRODUCTION

This matter comes before the Court on Plaintiffs' motion for partial summary judgment (Dkt. No. 13) and Defendants' motion for summary judgment (Dkt. No. 17). Having reviewed the Parties' briefing and the remainder of the record in full, the Court GRANTS Defendants' motion and DENIES Plaintiffs' motion for the foregoing reasons.

## II     BACKGROUND

**A. Factual Background**

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 13, 17) - 1

This is an insurance coverage dispute arising from a fire that occurred at 8301 Northeast 71st Street, Vancouver, Washington—the residential property of Plaintiffs James Hughes and Dena Hughes. Plaintiffs purchased a homeowners insurance policy, subject policy WA118833, covering the property from Defendant American Strategic Insurance Corporation ("ASI") on September 14, 2020. (Dkt. No. 19 at 1–2.) At that time, the property was under a mortgage loan with Columbia Credit Union ("CCU") and the taxes and insurance for the home were paid out of an escrow account. (Dkt. No 18-1 at 2–4.) Plaintiffs finished paying off the mortgage in July of 2021, at which point the escrow account was closed. (*Id*.) However, CCU was not removed as a "mortgagee" from ASI's account profile for Plaintiffs' policy; accordingly, notifications about Plaintiffs' insurance policy continued to be sent to CCU and the Plaintiffs themselves. (Dkt. No. 19 at 2.) Nonetheless, Plaintiffs understood they would be responsible for paying for the insurance and taxes on the property after the escrow account was closed. (Dkt. No. 18-1 at 5.) On September 14, 2021, Plaintiffs paid to renew the insurance for the policy period of September 14, 2021, through September 14, 2022, by making a credit card payment. (Dkt. No. 19-6 at 1.)

In December of 2021, Plaintiffs opened a Home Equity Line of Credit ("HELOC") from CCU. (Dkt. No. 18-1 at 5.) Plaintiffs signed an "Agreement to Provide Property Insurance" with CCU that listed the subject policy, WA118833, as the insurance covering the property. (Dkt. No. 18-3 at 1.) CCU subsequently reached out to ASI on December 13, 2021, in a letter entitled "Hughes mortgagee clause change request." (Dkt. No. 19-1 at 1.) CCU requested that ASI "add Columbia Credit Union on as a 2ND Mortgage Position (no escrow)" to the Plaintiffs' insurance policy. (Dkt. No 19-1 at 1–2.) CCU did not request that the first mortgage, which all Parties agree had already been paid off, be removed. (*Id*.) ASI added CCU as requested;

1  accordingly, Plaintiffs account profile with ASI listed two mortgages against the property when

2  in fact there was no mortgage against the property.  (Dkt. No. 19 at 2.)

3      Mr. Hughes was the member of the couple who "handled" insurance payments.  (Dkt.

4  No. 18-1 at 2.)  When Plaintiffs first opened the policy, Mr. Hughes registered for an online

5  account with ASI using his personal email address.  (Dkt. No. 19 at 3.)  He then signed up to use

6  ASI's "electronic signature process" and was presented with a message that required him to

7  check a box stating, "I agree to conduct this transaction for [policy number] electronically

8  pursuant to the terms & conditions."  (*Id*.)  The words "terms and conditions" appeared in bolded

9  blue letters and were hyperlinked:

10

11

12

13

14

15  (*Id*.)  If clicked, the hyperlink displayed the following text:

16      Your consent to receive insurance policy documents electronically applies to this
    transaction and any communications related thereto. You agree to ensure all information
17      needed to contact you electronically is current and up to date. You understand that you
    must have a computer and access to e-mail in order to conduct this transaction and future
18      transactions electronically. You have the right to withdraw your consent to receive
    insurance policy documents electronically and may do so by contacting your agent. You
19      have the right to request a non-electronic, paper copy of insurance policy documents at
    any time.

20
(*Id*.)  In order to finish registering for the electronic signature process, applicants must check the
21
box agreeing to the terms and conditions (*see supra*) and verify their password.  (*Id*.)  According
22
to ASIs data records, Mr. Hughes completed the electronic signature process at 7:16 P.M. on
23

24

1  September 13, 2020.  (Dkt. No. 19-5 at 1.)  He subsequently received insurance policy

2  documents at the email address he provided in the online portal.

3        The renewal payment deadline for the policy period of September 14, 2022, to September

4  14, 2023, was on September 14, 2022.  (Dkt. No. 19 at 4.)  On July 15, 2022, ASI emailed

5  Plaintiff a 12-page "renewal offer packet."  (Dkt. No. 19-7 at 1.)  The text of the email stated:

> We attached your current policy documents[,] that's where you'll find all your important policy details, like your coverages, bill plan, and agent information. If your policy is renewing, you'll need to make a payment. If your mortgage company pays your premium, they received this notice as well. Please check with them to learn when the payment will be made on your behalf. Otherwise, check the first few pages of the attached document to make sure you're on track with your payments and other items.

(*Id.*)  A "Renewal Premium Notice" was contained in the packet attached to the email.  In relevant part, the Notice stated:

> To accept this renewal offer and maintain your coverage, please pay the minimum amount due shown below. If your premium is paid by your mortgage company a copy of this invoice has been sent to your mortgagee listed on your Declarations page.  If the information for your mortgagee is incorrect please contact your agent to update it.

(Dkt. No. 19-8 at 7.)  The Notice listed "total amount due" as $1,471.00 and listed September 14, 2020, as the "due date."  (*Id.*)

      Three days later, on July 18, 2022, Plaintiff received an email from Progressive Customer Service ("Progressive")—the insurance agent, a separate entity from Defendant ASI.  The subject of the email read "Your renewal is on the horizon."  (Dkt. No. 15 at 17.)  The text of the email stated: "Your homeowner policy renewal period is starting soon. Because you pay insurance through your mortgage lender, no action is needed. They also received a bill and will pay on your behalf."  (*Id.* at 18.)

      Mr. Hughes opened the July 15, 2022, email but did not open the attachment, which included the 12-page packet containing the notice.  (Dkt. No. 18-1 at 9.)  When Mr. Hughes read

the email from Progressive, he assumed that it meant CCU would pay on his behalf, believing that it had resumed paying as a result of Plaintiffs opening the HELOC. (*Id*. at 8; Dkt. No. 18-5 at 3.) He did not check with CCU that they would be making the payment. (*Id*. at 9.) Mrs. Hughes was not aware of the emails sent to her husband's email address. (Dkt. No. 16 at 2.)

On August 30, 2022, ASI delivered a "Courtesy Payment Reminder" to Plaintiffs' address by regular mail. (Dkt. No. 19-9 at 1.) The top of the letter stated, "Notice of Policy Expiration Renewal Premium Due." (*Id*.) The text of the letter read:

> We recently sent a renewal offer for your insurance policy but haven't received your renewal payment yet. To maintain your coverage, please make your payment by the due date shown above. Keep in mind that if we don't receive your payment by this date, your policy will expire, and you'll no longer have coverage.

(*Id*.) Mr. Hughes does not remember receiving or opening the letter. (Dkt. No. 18-1 at 13.) Likewise, Mrs. Hughes does not remember receiving or opening the letter. (Dkt. No. 16 at 2.)

Plaintiffs did not pay the renewal by September 14, 2022, and the policy lapsed. (Dkt. No. 19 at 5.) On September 23, 2022, ASI sent an email to Mr. Hughes with the subject line "Important info attached: Please check over your policy documents." (Dkt. No. 19-10 at 1.) The text of the email did not explain that the policy had lapsed, rather it stated that policy documents with important details "like your coverages, bill plan, and agent information" were attached to the email. (*Id*.) One of the attached documents was entitled "Notice of Lapse Nonpayment of Premium." (Dkt. No. 19-11 at 5.) The Notice of Lapse stated: "Unfortunately, because we didn't receive the minimum amount due requested in a previous notice, your policy has expired as of the date shown above." (*Id*.) The letter indicated that coverage had terminated at 12:01 A.M. on September 14, 2022. (*Id*.) Based on the text of the email, Mr. Hughes "believed that the attachment only contained policy information," and did not open the attachments. (Dkt. No. 15 at

2.) Accordingly, Plaintiffs were not aware of the document explaining that the policy had lapsed and believed that their home continued to be insured. (*Id.*)

Plaintiffs' house was destroyed by a fire on August 11, 2023. (*Id.*) When Mr. Hughes called to report the claim to insurance on August 12, 2023, he was informed that the policy had lapsed. (Dkt. No. 18-1 at 12.) Plaintiffs allege that they incurred $500,000 in damages for the loss of the structure, $200,000 damages in personal property losses, and $50,000 in additional living expenses. (Dkt. No. 1-1 at 5–6.)

**B. Procedural History**

Plaintiffs originally brought suit in Clark County Superior Court against ASI and American Strategic Insurance Underwriters Corporation (hereinafter referred to as "Defendants"). (Dkt. No. 1 at 1.) Defendants removed the matter to this Court on February 9, 2024. (*Id.*)

Plaintiffs bring five causes of action against Defendants: breach of insurance contract, breach of the implied covenant of good faith and fair dealing, violation of the Washington Consumer Protection Act ("WCPA"), violation of Washington Revised Code § 48.30.015 ("unreasonable denial of a claim for coverage or payment of benefits"), and bad faith tortious conduct. (Dkt. No. 1-1 at 5–11.) Plaintiffs' claims are premised on the argument that "[b]ecause Defendants failed to communicate the upcoming renewal in the manner prescribed in [Washington Revised Code §] 48.18.290l(l)(b) and failed to provide notice of cancellation in the manner prescribed by [Washington Revised Code §] 48.18.290(l)(c), the Policy was renewed by operation of law in accordance with [Washington Revised Code §] 48.18.2901(1) and was in full force and effect on August 11, 2023." (*Id.* at 4.) Accordingly, Plaintiffs move for partial summary judgment "on the question of whether their ASI homeowner's insurance policy . . . was

in effect at the time of the loss and the question of whether Plaintiff's loss was a covered loss under the Policy issued by Defendants." (Dkt. No. 13 at 1.)

Contrastingly, Defendants maintain "there is no question of fact that Plaintiffs affirmatively consented to receive electronic notices" and "no question of fact that Plaintiffs received electronic renewal notices in accordance with the timeliness required by Washington law." (Dkt. No. 17 at 2.) Accordingly, in their cross motion for summary judgment, Defendants argue that "ASI rightfully denied Plaintiffs' claim for insurance coverage" and "all of Plaintiffs' claims for relief against ASI" fail as a matter of law. (*Id*.)

### III    DISCUSSION

**A. Consent to Receive Electronic Notices**

Before determining whether the email notices ASI sent in July of 2022 complied with Washington law, the Court must determine whether Plaintiffs' consent to receive electronic notifications about their insurance policy was effective. Washington "specifically allows an insurer to deliver insurance notices and documents electronically." *Jackson v. Esurance Ins. Co*., 412 P.3d 299, 303 (2017). However, Washington Revised Code § 48.185.005(4) provides that "[a] notice or document may be delivered by an insurer to a party by electronic means . . . only if":

- a) The party has affirmatively consented to that method of delivery and has not withdrawn the consent;
- b) The party, before giving consent, has been provided with a clear and conspicuous statement informing the party of:
  - i.   The right the party has to withdraw consent to have a notice or document delivered by electronic means at any time, and any conditions or consequences imposed in the event consent is withdrawn;
  - ii.  The types of notices and documents to which the party's consent would apply;
  - iii. The right of a party to have a notice or document in paper form; and
  - iv.  The procedures a party must follow to withdraw consent to have a notice or document delivered by electronic means and to update the party's electronic mail address[.]

Plaintiffs argue that the terms and conditions statement was not "conspicuous" because it was "hidden behind a hyperlink included in a single line of small text." (Dkt. No. 22 at 10.) Since a "user must, without being guided or prompted, choose to click on it," the statement was not legally sufficient, Plaintiffs conclude. (*Id*.) Plaintiffs do not cite caselaw in support of this interpretation. Defendants respond: "the hyperlinked Terms & Conditions setting forth Plaintiffs' rights and obligations regarding electronic communications is in blue text and was clearly visible to the applicant Plaintiff Mr. Hughes at the time he clicked the box to provide consent and move forward with the registration process." (Dkt. No. 26 at 5.) Moreover, Defendants note, courts have consistently found that hyperlink terms and conditions in close proximity to an electronic acknowledgment are legally enforceable. (*Id*. at 4) (citing *Grant v. T-Mobile USA, Inc.*, No. 2:23-CV-01946-MJP, 2024 WL 3510937, at *3 (W.D. Wash. July 23, 2024); *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022); *Dohrmann v. Insuit, In*c., 823 F. App'x 482, 484 (9th Cir. 2020)).

      The Ninth Circuit has determined that "clickwrap agreements"—or agreements where users are presented with contractual terms on a pop-up screen and must check a box stating "I agree" to proceed—are enforceable if "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). The requirement of "conspicuousness" thus mirrors the Washington law standard. *See* Wash. Rev. Code § 48.185.005(4)(b). The Ninth Circuit has determined that "to be conspicuous . . . a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman,* 30 F.4th at 856. Courts have

consistently found that hyperlinked notice of terms and conditions are enforceable if they are underlined, capitalized, or bolded and "set off from the surrounding text by brightly colored front." *Regan v. Pinger, Inc.*, No. 20-CV-02221-LHK, 2021 WL 706465, *7 (N.D. Cal. Feb. 23, 2021); *see also Weimin Chen v. Sierra Trading Post, Inc.*, No. 2:18-CV-1581-RAJ, 2019 WL 3564659, *3 (W.D. Wash. Aug. 6, 2019) ("the word 'Term' in the Consent line, which hyperlinks directly to the TOU, is both capitalized and underlined and thus distinguishable from the surrounding text"); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78-79 (2d Cir. 2017) (finding hyperlinks reasonably conspicuous because they were both in blue and underlined); *Berman*, 30 F.4th at 857 ("Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage."). Here, the statement is bolded and "set off from the surrounding text" in bright blue text. *Regan,* 2019 WL 3564659, *3; (Dkt. No. 19 at 3). The Court therefore finds it sufficiently "conspicuous" for the purposes of Washington law. *See* Wash. Rev. Code § 48.185.005(4).

Plaintiffs further assert that the terms and conditions statement is not "clear" because it "fails to clearly identify the types of notices and documents to which any consent applies" and "states only that it applies to 'insurance policy documents.'" (Dkt. No. 22 at 10.) The "ambiguity [of the terms and conditions statement] demonstrates the lack of the clarity contemplated by [Wash. Rev. Code §] 48.185.005(4)(b)," Plaintiff states. (*Id*.) Defendants respond: "there is no question that (1) ASI's above-quoted language provided the requisite notice that all communications related to the e-policy, including renewal notices, would be sent electronically and (2) regardless of the language contained in ASI's Terms & Conditions,

1  Plaintiffs were actually aware that they were receiving renewal notices by email." (Dkt. No. 26

2  at 6.)  Washington law specifies that parties must be informed about "the types of notices and

3  documents to which the party's consent would apply."  Wash. Rev. Code § 48.185.005(4)(b).

4  ASI's terms and conditions state that by clicking "I agree," the policy holder is "consent[ing] to

5  receive insurance policy documents electronically."  (Dkt. No. 19 at 3.)  Indeed, the terms and

6  conditions statement uses the words "insurance policy documents" three times, making it clear

7  that the "types of notices and documents" contemplated are those that pertain to the signor's

8  insurance policy.  Wash. Rev. Code § 48.185.005(4)(b).  Although the terms and conditions

9  statement does not provide an exhaustive list of documents one might receive, the term

10  "insurance policy documents" sufficiently informs a signor of the "type" of document that he or

11  she is agreeing to receive via email for the purposes of Washington law.  *See id*.

12      Finally, Plaintiff asserts that the declaration of Kellie O'Nuallian— ASI's director of

13  underwriting—is not admissible and therefore cannot be relied upon to show the specific steps

14  Plaintiffs took during the sign-up process. (Dkt. No. 22 at 5) ("O'Nuallain's lack of personal

15  knowledge also leaves her unable to swear to the statements in her Declaration relating to

16  specific actions ASI insists Plaintiffs did or must have taken during the sign-up process.").  Nor

17  can the exhibits appended to the declaration be relied upon, Plaintiffs continue, because ASI

18  failed to authenticate them.  (*Id*. at 6) ("ASI has not presented any evidence that those documents

19  are what ASI claims they are or represent what ASI claims they represent [and] ASI has also not

20  made the necessary showing that O'Nuallain has the personal knowledge to testify regarding the

21  steps Plaintiffs took during the sign-up process[.]").  Defendants respond by pointing out that

22  "O'Nuallian is familiar with ASI's relevant policies and procedures related to online applications

23  and delivery of notices/electronic communications" and "researched and reviewed both the

24

ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 13, 17) - 10

details of the specific Policy at issue and ASI's applicable policies and procedures." (Dkt. No. 26 at 6.)

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e)). The foundational "requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *United States v. Tank*, 200 F.3d 627, 630 (9th Cir. 2000). The proponent of evidence "need only make a prima facie showing of authenticity, as the rule requires only that the court admit evidence if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *Id*. (cleaned up). At summary judgment, "a proper foundation need not be established through personal knowledge but can rest on any manner permitted by Federal Rule of Evidence 901(b) or 902." *Id*. at 774. The documents at issue are properly authenticated, as O'Nuallian's detailed testimony sufficiently supports a finding that the documents are what it is claimed they are. *See* Fed. R. Evid. 901(b) (providing ten approaches to authentication). Moreover, given her position as a director of underwriting at ASI, O'Nuallian possesses the requisite personal knowledge to explain the details of ASI's policies and procedures. Defendants have made a prima facie showing of authenticity.

Accordingly, there is no genuine dispute of material fact that Plaintiff's validly acquiesced to receive policy documents electronically under Washington law.

B. Whether the Notice Satisfied Washington Law

Washington Revised Code § 48.18.2901 provides that insurers "must renew any insurance policy" unless "[a]t least twenty days prior to its expiration date, the insurer has

communicated, either directly or through its agent, its willingness to renew in writing to the named insured and has included in that writing a statement of the amount of the premium or portion thereof required to be paid by the insured to renew the policy, and the insured fails to discharge when due his or her obligation in connection with the payment of such premium or portion thereof." Defendants assert that "ASI's disclosures were in full compliance" with Washington law. (Dkt. No. 17 at 15) ("Plaintiffs decided where they wanted electronic notices to be sent at the time they obtained the Subject Policy" and "there is no question of fact that ASI delivered the renewal offer to [Mr. Hughes' email address] more than twenty days before the date the policy was due for the renewal payment."). Therefore, Defendants argue, "the Subject Policy lapsed and was not active at the time of the residential property fire at issue." (*Id*. at 18.)

Mr. Hughes confirmed receipt of the July 15, 2022, email containing the renewal packet. (Dkt. No. 18-1 at 9.) The "Renewal Premium Notice" in the packet instructed Plaintiffs to "please pay the minimum amount due shown below" to maintain their coverage and listed "total amount due" as $1,471.00. (Dkt. No. 19-8 at 7.) Thus, the notice came in 61 days before the renewal deadline and stated the amount required to be paid in order to maintain the policy. (*Id*.) Accordingly, it complied with Washington law. Although ASI's system of attaching renewal notices in lengthy packets is not a paragon of clarity for email recipients, its procedures do not run afoul of the law. Moreover, insureds in Washington have "an affirmative duty under Washington law to read their policy and be on notice of the terms and conditions of the policy." *Dombrosky v. Farmers Ins. Co. of Washington*, 928 P.2d 1127, 1134–35 (Wash. Ct. App. 1996), *as amended* (Feb. 7, 1997). Thus, Plaintiffs' policy validly lapsed when they did not make the renewal payment.

## IV   CONCLUSION

Accordingly, Defendants' motion for summary judgment (Dkt. No. 17) is GRANTED. Plaintiffs' motion for partial summary judgment (Dkt. No. 13) is DENIED.

Dated this 14th day of February, 2025.



David G. Estudillo
United States District Judge